UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 1:16-mj-6 |
| | ) | |
| EMILY LYNN MORGAN, | ) | Hon. John F. Anderson |
| | ) | |
| Defendant. | ) | |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION FOR
RECONSIDERATION OF DETENTION ORDER**

COMES NOW the United States of America, by its attorneys Dana J. Boente, United States Attorney for the Eastern District of Virginia, Anna G. Kaminska, Special Assistant United States Attorney, and Gene Rossi, Assistant United States Attorney, and hereby responds to defendant's Motion for Reconsideration of Detention Order, which seeks her immediate release from custody. (Dkt. #12.) Defendant, who is currently pregnant with her second child, contends that her release pending trial is warranted primarily because she is not receiving proper medical attention at the jail where she is being held. Defendant further argues that she would pose no danger to her unborn child and her toddler son if released because she has "gotten over her need" for drugs during the last two weeks in custody. (Dkt. #12, at 3.) As set forth more fully below, defendant's serious drug abuse during her current pregnancy and repeated endangerment of her toddler son during a history of drug-related activity while she was out in society—when contrasted with the safe and effective level of medical care that she is receiving at the jail— overwhelmingly compel her continued detention pending trial. Accordingly, the Government respectfully submits that defendant's motion for reconsideration of the Court's detention order should be denied.

## I.       Background

Defendant was arrested on January 7, 2016 in connection with a criminal complaint charging her with conspiracy to distribute a mixture and substance containing a detectable amount of heroin, a Schedule I controlled substance; oxycodone, a Schedule II controlled substance; and alprazolam, a Schedule IV controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and 846. (Dkt. #1.)  On January 8, 2016, defendant made her initial appearance in the Eastern District of Virginia and was held pending a preliminary hearing and detention hearing set for January 11, 2016. (Dkt. #7.)  On January 11, 2016, defendant's counsel waived the preliminary hearing, and the Court found probable cause to support the criminal complaint.  (Dkt. #10.)   A detention hearing followed on the same day.  During the detention hearing, the Government presented the testimony of FBI Special Agent Brittany Maher.

Agent Maher testified regarding her training as an FBI special agent and her experience as a pharmacy technician in identifying, among other things, prescription narcotics.  Initially, she adopted as part of the testimony her affidavit in support of the criminal complaint, which detailed a year-long conspiracy in which law-enforcement officers conducted and observed five separate controlled buys of heroin, oxycodone, and alprazolam directly from defendant.  Agent Maher also testified regarding the circumstances surrounding defendant's arrest, when agents found both drugs and drug paraphernalia in defendant's shared bedroom.  These items included crushed pills, cut straws, a folded dollar bill, a pill crusher, empty pill bottles, a scale, and a burnt spoon, which were strongly indicative of defendant's drug abuse.  Agent Maher further testified that although defendant had a valid prescription for Subutex, which is intended to ease opiate-withdrawal symptoms but may itself be abused, defendant received a text on her cell phone from a drug dealer during the arrest offering to provide defendant with more Subutex.  In addition,

Agent Maher explained that during a search executed at defendant's prior residence, agents had observed a cut straw on defendant's person and a container of prescription pills in her car.

Moreover, Agent Maher testified regarding defendant's failed role as a cooperator in a drug-trafficking investigation last year.  Agent Maher noted that defendant was admonished at the outset of the cooperation relationship with the FBI that she was prohibited from engaging in any illegal activity or pursuing any independent activity in the course of the investigation.  In blatant disregard of these warnings, defendant continued to both use and deal illegal drugs.  In particular, Agent Maher learned from a witness that he had acquired crack-cocaine for defendant in late May 2015 and watched her smoke it in her house while her toddler son slept in the next room.  Agent Maher further learned that around the same time the witness also observed defendant shoot up heroin.  Agent Maher testified that such drug use was especially concerning as it likely would have occurred just before defendant's pregnancy or in its early stages.

In addition, Agent Maher explained that defendant did not disclose to the FBI covert conversations that she had with the subject of the FBI's investigation.  During her time as a cooperator, the FBI monitored defendant's known cell phone.  In an attempt to obstruct the investigation, defendant texted the subject of the FBI's investigation on her boyfriend's cell phone, which was not being monitored by the FBI, and told the subject that she planned to ask him for additional drugs on her monitored phone and instructed him to answer falsely that he did not have any drugs.  As Agent Maher explained, defendant's obstructive conduct ultimately hampered the FBI's efforts to observe the subject consummating drug deals.

Finally, Agent Maher testified regarding the role of defendant's toddler son in connection with her drug-trafficking activities.  In particular, Agent Maher explained that law-enforcement agents observed defendant participate in what appeared to be four different drug deals in her car

while her then 18-month-old son was strapped into his car seat in the rear of the car.  On one particular occasion, defendant and her boyfriend planned a drug rip of the dealer, intending to steal his supply of drugs, and brought along her son.  During the transaction in or near defendant's car, defendant's boyfriend in fact stole the dealer's supply of drugs, and the dealer thereafter chased after him.  During this incident, defendant's son was again present in the rear of the car.  As Agent Maher testified based upon her training and experience, drug dealers sometimes carry firearms during a drug deal.

Defense counsel did not cross-examine Agent Maher on these or any other points but argued for defendant's release based upon, among other things, her dissatisfaction with the food at the jail.  After considering the evidence, the Court properly determined that defendant was subject to a rebuttable presumption of detention pursuant to 18 U.S.C. § 3142(e)(3)(A) based upon the nature of the charged offense and ruled that the defendant had failed to overcome this presumption.  Accordingly, the Court ordered that defendant be held without bail pending trial but noted that it would reconsider its decision upon a motion by defendant.  (Dkt. #10.)  This motion for reconsideration of the detention order by defendant ensued.

## II.    Argument

Defendant should continue to be detained because she poses a significant danger to her unborn child and toddler son based upon her unabated drug abuse and distribution activities.  In addition to relying upon the evidence presented at the initial detention hearing, the Government is prepared to elicit additional evidence at the hearing on defendant's reconsideration motion relating to both the adequate level of care that she is receiving at the jail and the danger that defendant's release would pose to her children.

*Defendant's Proper Medical Care at the Jail[1]*

In sum and substance, the Government's evidence establishing that defendant is receiving proper medical care while in custody at the Alexandria Detention Center would include testimony from an FBI agent as to the following key facts:

- On or about January 7, 2016, the day of defendant's arrest, Agent Maher personally accompanied defendant to Alexandria Inova Hospital for over four hours while defendant was evaluated by a medical doctor, who cleared defendant to head to jail.

- On or about January 12, 2016, the day after defendant's detention hearing, two FBI agents met with both the Duty Lieutenant and the Head of Nursing at the Alexandria Detention Center in order to discuss defendant's medical concerns. Subsequently, on January 19, 2016, an FBI agent spoke again by telephone with the Head of Nursing and also with a physician's assistant at the facility. Each staff member was very familiar with defendant, her condition, and her continued care.

- The medical personnel at the jail confirmed that defendant is being housed within the medical unit of the jail itself, thereby allowing staff to monitor her closely and continuously each and every day.

---

[1] It should be noted that defense counsel's representation that he "has brought this dire situation to the attention of the government and has received no response" (Dkt. #12, at 2) is demonstrably untrue. The Government has discussed the matter of defendant's medical care with defense counsel both in person and by email on numerous occasions, the last time on January 15, 2016, when it provided a written update as to defendant's care at the jail and as to the opinion of her own treating obstetrician/gynecologist that she should remain in custody because she has abused drugs during her pregnancy. The Government also requested by email defense counsel's cellular contact information so that the status of defendant's care could be discussed further over the long holiday weekend, and it was defense counsel who did not respond. The Government meanwhile has expended substantial efforts, as detailed further below, to assess defendant's medical condition and the appropriate level of care by interviewing the Duty Lieutenant at the jail, the Head of Nursing at the jail, as well as defendant's outside treating nurse and doctor at Kaiser Permanente.

- At the jail, a registered nurse is available on site 24 hours a day; a physician's assistant is available on site 16 hours per week; and a medical doctor is available on site 8 hours per week. Both the physician's assistant and the medical doctor also are on call 24 hours a day. In addition, a licensed practical nurse makes routine rounds at the jail. Contrary to defendant's contention (Dkt. #12, at 4), the Head of Nursing confirmed that there has never been any "understaffing" issues in the medical unit the entire time that defendant has been in custody.

- In addition to the medical care that defendant is receiving at the jail itself, defendant has been treated specifically by an obstetrician/gynecologist at Alexandria Inova Hospital, which is located within a short driving distance of the jail. On or about January 12, 2016, defendant was evaluated by this offsite obstetrician/gynecologist, who indicated that the baby is doing well and cleared defendant to return to jail. In addition, defendant is scheduled for another obstetrician/gynecologist visit on January 22, 2016.[2]

- On or about January 14, 2016, after acquiring a proper release from defendant, two FBI agents also called defendant's outside medical practice, Kaiser Permanente, to discuss her condition and treatment. During that call, agents spoke with defendant's treating nurse and an obstetrician/gynecologist. These medical personnel explained that defendant's progress should be monitored weekly and confirmed that such monitoring could be accomplished by a doctor

---

[2] Defense counsel's representation that he "was told by the government that [defendant] had an OB/GYN appointment outside the jail at a clinic with an ultrasound machine on Friday, January 15, 2016 . . . [b]ut [defendant] was never taken to the clinic and there was no explanation as to why" (Dkt. #12, at 4) again contains inaccurate facts. The Government explained to defense counsel clearly and in writing on January 15, 2016 that defendant would be seeing the offsite obstetrician/gynecologist on Friday, January 22, not on Friday, January 15.

contracted by the Jail.  Kaiser staff further indicated their willingness to share medical records with any such medical provider.

- Kaiser staff noted serious concerns regarding defendant's care of her unborn child in light of the fact that she tested positive for cocaine use in or about October 2015, which was during her pregnancy.  The nurse explained that the office had requested follow-up testing but defendant never reappeared for testing.  The nurse further expressed concern over the fact that defendant had denied any illegal drug use to her doctor.  Defendant also claimed that she was not taking Subutex. Based upon these and other factors, the medical professionals at Kaiser stated that they had no objection to defendant's incarceration as long as she had access to an obstetrician/gynecologist on a weekly basis.

- With regard to defendant's dose of Subutex, the medical staff at the jail confirmed that defendant is receiving the proper dose as prescribed by her outside doctor. Prior to the filing of this motion, the Government met with defense counsel and defendant, who indicated that she was under-prescribed her daily dose of Subutex. Following this conversation, FBI agents dutifully addressed the matter with jail staff, who thereafter investigated defendant's prescription history and brought the matter to the attention of medical professionals at Alexandria Inova Hospital that same day.   At the defendant's request, and after examination by an obstetrician/gynecologist, a new prescription was issued to her.

- The Government has researched available options regarding Bureau of Prison facilities that would accommodate defendant's desire to remain with her baby and has advised her of the Greenbrier Birthing Center in Hillsboro, West Virginia,

which permits mothers in custody to stay with their infants inside of the facility for up to 12 months.

*Defendant's Repeated Endangerment of Her Children*

In addition to the testimony regarding defendant's proper medical care while in custody, the Government is prepared to elicit testimony from the FBI case agent regarding defendant's continued endangerment of her unborn child.  Such testimony would include the irrefutable fact that defendant has abused a variety of drugs during her pregnancy, despite knowing that doing so is harmful.

- As indicated above, defendant's doctor at Kaiser Permanente learned that she had tested positive for cocaine in or about October 2015, during her pregnancy, and thereafter appeared to evade calls from the office for follow-up testing.

- Following the detention hearing, agents executed a search of defendant's cell phone that revealed a litany of alarming text messages regarding her recent and continuing drug abuse in just the past few weeks.

- On December 30, 2015, for example, defendant sent a text message to her live-in boyfriend and the father of her baby, Wesley Martin, that she planned to avoid blood work and urinalysis at her obstetrician/gynecologist's office because she knew that cocaine would be detected as she had used it for "days in a row."  On January 5, 2016, defendant again texted Mr. Martin, stating, "They are trying to make me go do blood work like now . . . I can't fucking do that today!"

- Throughout December 2015, defendant sent text messages to a number of apparent drug dealers requesting more drugs and acknowledging that the drugs were to her liking.[3]

In addition to the endangerment of her unborn child, defendant also has continued to involve her toddler son in drug-related activities, including as follows:

- Defendant continues to bring along her toddler son on various drug buys. On December 9, 2015, for example, defendant texted an apparent drug dealer and advised that she was putting on her son's shoes before heading out to pick up more drugs. On December 14, 2015, defendant texted the same drug dealer and advised that she could stop by to pick up the drugs with her son once he was done with his nap.

- Defendant also uses her son to help disguise urinalysis testing for the benefit of Mr. Martin. Mr. Martin appears to suffer from his own serious drug addiction and is not in a position to help defendant with taking proper care of herself. As part of aiding Mr. Martin to evade detection of his own drug use, text messages reveal that defendant instructs her toddler son to urinate in a cup that she then gives to Mr. Martin. While such conduct is not inherently dangerous to her son, it reflects defendant's poor decision-making and efforts to permit harmful drug activity to continue in her home.

---

[3] While in no way approaching the gravity of her abuse of cocaine and prescription pills during her pregnancy, defendant also texted Mr. Martin on December 23, 2015 inquiring into the whereabouts of her cigarettes.

### III.     Conclusion

There can be no question that defendant is in the throes of a serious drug addiction that she is not capable of treating alone.  Although this fact is alarming enough, defendant is also pregnant, and her continued drug abuse creates risks to her unborn child that simply are intolerable.  Defendant's addiction also clouds her judgment as to the proper care of her toddler son, who has observed her numerous drug deals, witnessed a dangerous drug rip, and been used to provide clean urine.  The jail where defendant currently resides meanwhile provides good and attentive care to her and her baby both inside the facility and at the outside contracted clinic, which her treating obstetrician/gynecologist at Kaiser Permanente has concluded sufficiently addresses all of her medical needs.

Defendant's argument that the wisdom of her release is a "no-brainer" (Dkt. #12, at 6) is thus belied by overwhelming evidence to the contrary.  As defendant acknowledged in a text message to Mr. Martin during an apparent moment of clarity on December 8, 2015,

> I'm scared to death deep down to have this baby bc of the choices we have made and I have to cut back on everything asap. It's just getting too close and I refuse to make a baby feel discomfort bc of my decisions and being irresponsible.  Idk [I don't know] how this has gotten this far but have to put 10000% effort into making sure nothing will [a]ffect the baby and I am scared I won't be able to do it . . . .

The very next day, defendant sent a text message to a drug dealer about purchasing more drugs.

Based upon the foregoing, the Government respectfully submits that defendant's continued detention is necessary to ensure the safety of defendant and her children and asks that her motion for reconsideration of the Court's detention order be denied.

Respectfully submitted,

Dana J. Boente
United States Attorney


By: /s/_____

Anna G. Kaminska
Special Assistant United States Attorney
Gene Rossi
Assistant United States Attorney
2100 Jamieson Avenue
Alexandria, VA 22314
Tel.: (703) 299-3834
Fax: (703) 299-3980
Email: Anna.G.Kaminska@usdoj.gov

## CERTIFICATE OF SERVICE

I certify that on January 20, 2016, I filed electronically the foregoing document with the

Clerk of the Court using the CM/ECF system, which will send notice of the filing to all counsel

of record.


Respectfully submitted,

Dana J. Boente
United States Attorney


By: /s/_____
Anna G. Kaminska
Special Assistant United States Attorney
2100 Jamieson Avenue
Alexandria, VA 22314
Tel.: (703) 299-3834
Fax: (703) 299-3980
Email: Anna.G.Kaminska@usdoj.gov